TALIAFERRO, Judge.
For the alleged loss of vision of the right eye, due to an accident while performing the duties of his employment with Louisiana Long Leaf Lumber Company, plaintiff seeks to recover judgment against his employer and its insurer, United States Fidelity and Guaranty Company, for compensation on the basis of total permanent disability to perform the work he was performing when injured, or “work of the reasonably same or similar character”. Specifically, he alleged that as a result of said accident he has “suffered and does now suffer from traumatic iritis and traumatic cataract of his right eye”, with consequent loss of vision thereof.
In the alternative, he prays for judgment for $30 per week for 100 weeks, as provided for the loss of vision in one eye. Act No. 85 of 1926, Section 8, Subdivision 1(d), paragraph 9, LSA-RS 23:1221 (4) (i).
*34 The alleged accident oocu-rred on August 5, 1950, while plaintiff was maneuvering his truck and trailer into a position so that they could -be loaded with logs. No other person was present.
The accident is alleged to have happened in this manner, to-wit: “A limb became bowed against the windshield, of plaintiff’s truck and becoming disengaged, struck plaintiff in the right eye with great force”, etc.
In a supplemental petition, plaintiff alleged that the cataract referred to in the original petition was “either caused by or aggravated by the accidental injury referred to” in said original petition.
Defendants resist the suit on the ground, primarily, that plaintiff suffered no accident, as by him alleged; but, alternatively, if any -accident did happen, it was of a minor nature, the effects of which ceased within one week thereafter; that the cataract in his right eye, which does impair the vision of that member, is an old condition, due to disease or other cause and in no manner connected with an -accidental injury arising out of plaintiff’s said employment; that, in any event, he is not disabled to drive' a truck as he was doing when injured and, therefore, the specific disability provision of the statute for loss of an eye is not applicable.
The Court awarded judgment for $30 per week for the period of disability, not exceeding 400 weeks, and defendants appealed.
Plaintiff’s version of how the accident happened is as follows, to-wit: That in maneuvering the truck and trailer, just prior to loading logs, the trailer got hung behind a stump, and to- observe its movements while he was “hunching” the truck forward, he extended his head out of the left truck door; that the limb was against the left end of the windshield and as the truck gradually moved forward pressure against the limb increased until finally released, and in the reaction or spring-back it struck his right eye just as he began to turn his head to the right. He added that if his nose had not caught part of the blow his eye would have been knocked out. He also testified that excruciating pain followed the blow and he got out of the truck and Truly Midkiff, the boy who was doing the loading, backed the vehicle out -and completed the loading. Plaintiff drove the loaded vehicle to the mill. It was a Saturday.
Plaintiff testified that the eye gave him much pain that night, and the next day; that he visited his father Sunday and on returning home that afternoon he went to -a hospital, hoping to find the nurse on duty to render him aid, but she was not there; that notwithstanding the persistence of the pain, he returned to duty Monday morning, and brought one load of logs to the mill, a friend, however, doing the driving. He says it was while making this trip he discovered he couldn’t see anything out of the right eye, and that that condition has not improved to any extent; that he then informed his foreman of the situation and was directed to see the employer’s physician in Many, Louisiana. On reporting to the clinic, Dr. Booker, general practitioner, examined and treated him. He found an opacity of the eye, which means that light was not going through the lens because of a cataract; the redness of the conjunctiva, which is the outer covering of the eyeball proper. He found no ulceration in nor laceration of the eye structure. The redness was the only evidence, he says, that could be construed to be traumatic, and, he adds, it could have been the result of a lick. However, he also said that it could have been caused from infection, a -cold, foreign matter, or from rubbing.
Not being an eye specialist, and plaintiff continuing to complain of serious pain in the eye, Dr. Booker sent him, on August 8th, to Dr. A. P. Crain, an eye specialist of eleven years experience, in the City of Shreveport, Louisiana. Dr. Booker had asked him to examine plaintiff’s eye and determine if an injury to the eye had been sustained, and, if so, how much. Plaintiff gave him a history that the eye had been hit by a limb three day-s previous.
Dr. Crain found the eye somewhat red with fluid under the covering, particularly the lower lid. He found “in the lens of the right eye a posterior subcapsular cata *35 ract * * * and also the nucleus of the lens contained a cataract. Vision in that eye was reduced to perception of light. The left eye was found to be normal. The refraction of the right eye vision could not be improved with glasses.” He did not find evidence of inflammation within the “interior-anterior chamber of the eye.” He testified that the impairment of vision was largely due to the opacity in the lens, and that the opacity was attributable to the cataracts. He found no other pathology; and would not give opinion as to the cause of the redness of the eye, there being several things that could produce such condition, but admitted it could have been due to trauma. He was of the opinion that the presence of the cataracts was not due to trauma, but were in existence for some time prior to August Sth. He did not believe the conditions he found were the .result of the lick, but were of long standing; he admitted that cataracts could be created by trauma and formed immediately thereafter.
He also found no iritis; that is, inflammation of the iris. Dr. Crain examined plaintiff again on August 11th. The inflammation of the conjunctiva had cleared considerably, but otherwise no change in pathology had occurred. It was his opinion that relief from the loss of vision could only be attained by removal of the cataract by surgery.
On cross-examination Dr. Crain admitted that it was barely possible that iritis could have been present as found by another doctor, and overlooked by him, and that if present he would have experienced difficulty in reconciling therewith the character of cataracts he found. He did not completely rule out trauma as the possible cause of the cataracts.
It is shown that a traumatic cataract comes into existence when the lens of the eye (capsule) is pricked or bruised. Nature’s process to heal is comparable to that observed in an exterior flesh wound. The wound in the lens is healed but the scab created in doing so, called cataract, remains to affect vision. The nucleus cataract is that which forms in or on the front part of the lens.
Dr. Noel T. Simmonds, eye specialist of over twenty years experience, examined plaintiff’s eyes on September 15, 1950. He found two cataracts of the same character and location as were found by Dr. Crain. The nuclear cataract, he says, clouds the center of the lens. It is not considered to be of traumatic origin. The posterior subcapsular cataract, which, he says, clouds the lens just under the posterior capsule, is generally considered to be due to toxins “getting into the eye through the blood stream.” It was Dr. Simmonds’ positive opinion that the nuclear cataract was not of traumatic origin, and “that the subcap-sular cataract, it is remotely possible, could have been caused by it and/or probably was aggravated by it.” He was certain the nuclear cataract was in existence at time of the accident, but was not certain that the other one was not created by the injury. The impairment in vision was due to opacity attributable to the cataracts. He found the vision of the left eye practically normal, but found no iritis. He said, however, it was likely it followed the injury, but had subsided before he made the examination, He thought the chances greater that the subcapsular cataract was aggravated by the lick rather than a result of it.
Dr. Simmonds said the nuclear cataract was enough to affect vision and the other one interfered a good bit with it, but could not say which is producing the greater degree of impairment. He was of the belief that plaintiff was exaggerating the degree of poor vision, but that no tests could be employed to prove the fact. He was not asked, nor did he volunteer opinion thereon, as to whether the impaired vision of the eye could be’ removed or reduced by surgery.
Dr. Edgar W. Booth who specializes in ophthalmology, and has done so for two years in Shreveport, which experience was preceded by three years of special training in the Charity Hospital in New Orleans, examined plaintiff on August 26th and again on September 8th. The second examination was mainly done to observe if any changes in the patient’s condition had come -about in the interim of two weeks. *36 At time of the first examination plaintiff was complaining of frequent intermittent pains in the eye. Dr. Booth, at that time, found existing a posterior subcapsular cataract and iritis. He did not find the nuclear cataract that Drs. Simmonds and Crain found. At time of second examination the complaints of pain had virtually ceased; the iritis had subsided some, but other conditions had not changed. He said the iritis did not affect the vision, but the existence of it was evidence of a trauma to the eye sufficient in force to produce the inflammation or set in motion forces that would do so.
All of the eye specialists concur in the contention that the vision of the right eye is so much impaired that plaintiff is rendered therefrom incompetent. to operate a truck loaded with logs. This is largely due, they say, because of the inability to accurately judge distances and objects. It would be dangerous for him to do so, not only for himself, but to others on the highway.
We are not convinced that a stump of a limb one inch in diameter, as contended, rebounded with much force and hit the eye. Had this happened, surely there would have been evidence thereof in the way of wound, bruise, etc. on the nose and about the orb of the eye. Plaintiff testified: “It was a bush that grew up there; the swampers had cut it off”. It is more likely that aJ switchlike limb -did the damage.
As regards the alleged accident, Truly Midkiff, the boy who drove the mules used in loading, testified that when he came to the truck, preparatory to loading the logs, plaintiff told him that a limb hit his eye and that he, Midkiff, “backed the trailer on down there and me and, him loaded it.” It was not Midkiff’s duty to handle the truck and trailer. He must have done so on this occasion because of plaintiffs temporary inability to do so. Plaintiff’s wife testified that he complained of .the eye paining him the night of August 5th and the following night, and that the third night was spent by him in the clinic; that he wore a patch over the eye for several days, and complained very much of pain.
The testimony convinced the trial judge, as it does us, that regardless of some weak pertinent circumstances, plaintiff did experience an accident in the manner and at the time alleged.
The preponderance of the expert testimony supports the contention that two cataracts were in existence when plaintiff was examined by Drs. Booker, Crain and Simmonds, and that the blow from the limb or switch produced iritis. We also conclude that the testimony shows that the nuclear cataract was in some form and degree in existence when the accident occurred, but not, perhaps, of sufficient size then to materially affect vision. We are not so sure that the other cataract existed when the accident happened. If so, the lick evidently aggravated it to the degree that vision was affected.
It is proven that it is not uncommon for a person to lose the power of vision in one eye and be unaware of it for some time. Something occurs that brings to him the knowledge of the absence of vision, and a competent eye specialist can determine whether the condition is new or not.
Prior to entering defendant’s employment, plaintiff underwent examination to test his physical fitness for the work he was to do. The vision of both eyes then was pronounced perfect. It would be a rather extreme coincidence to have lost the power of vision of the right eye in the interim and not have discovered the loss until so soon after this accident. It is also well established that he operated the log truck perfectly prior to the accident, a feat that requires two good eyes.
We are now faced with the task of determining which of the provisions of the Workmen’s Compensation Law has appropriate application to the factsi of this case.
Plaintiff is 42 years old. His education is limited. For 12 years prior to the accident he mainly, if not exclusively, earned a livelihood by driving trucks laden with logs. Hard labor is his calling. He is strong and vigorous, not ever having serious illness. His left eye is yet perfect and it is a fact, fairly well known, that loss of sight of one eye strengthens the power of vision in the other. It is shown, and *37 also well known, that while immediately after the loss of sight of one eye much inconvenience is experienced thereby, hut this gradually disappears as time passes and optical adjustments are made. While one eyed men are not, as a rule, employed to operate log trucks, they are employed in many lines of work and render efficient services therein. There are many kinds of work plaintiff, with the loss of an eye, can as well perform as any able bodied man can perform. We do not believe the general disability provisions of the act have application here.
Plaintiff’s energetic counsel have cited and quoted from several .eye cases with which we find no fault; but, in cases of this character, each must be determined from its own peculiar facts.
For the reasons herein assigned, the judgment from which appealed is amended by reducing the period of compensation payments to 100 weeks, and as thus amended, the judgment is affirmed with costs.